Oral argument not to be pursued 15 minutes per side. Mr. Imran Syed, supervising attorney, to be argued by law student Ms. Laura Connelly for the appellant. Morning. May it please the court, Imran Syed of the Michigan Innocence Clinic at the University of Michigan Law School. I'd like to introduce Laura Connelly who's been approved to argue this case. You may proceed. May it please the court, my name is Laura Connelly on behalf of petitioner Donyelle Woods. Joining me at council's table are my supervising attorneys Imran Syed and David Moran. I'd like to reserve three minutes for rebuttal. Three minutes, you may. This is a Confrontation Clause case where a key witness was allowed in the prosecutor's own words to testify from the dead. That witness, Chavez Johnson, was standing next to the victim at the time of his murder and returned to the police station four days after the fact in order to identify the perpetrator via composite sketch. The Michigan courts approved the admission of that sketch based on an unreasonable interpretation of the U.S. Supreme Court's ongoing emergency doctrine from Davis v. Washington. The admission of the sketch violated Mr. Woods' essential constitutional right to confront the witnesses against him. The sketch was critical because the prosecutor herself stated that it was an independent eyewitness identification upon which the jury could rely. This case involves a simple application of Crawford v. Washington. Crawford states that the Confrontation Clause applies to witnesses against the accused, in other words, those who bear testimony. This sketch is undoubtedly testimonial. Mr. Johnson returned to the police station in order to identify the perpetrator of the homicide, and the most fundamental piece of evidence in a homicide prosecution is the identity of the murderer. Well, but when you say it's just that, isn't the emergency exception clearly it's also an identification, but which is the major purpose? Suppose, I mean, I take it from what you are saying is that if the sketch was made on the spot or three hours later, it would be okay, but because it's four days later, that's what makes it bad? Certainly, Your Honor, the time is certainly a factor in all of this, but we also have to look at the circumstances that surround the creation of the sketch, and that's where the ongoing emergency exception comes in. And in Davis v. Hammond, the Court gave four factors in determining whether statements are made in response to an ongoing emergency, and in this case, the four factors all support Mr. Woods, primarily of which is that Mr. Johnson was talking about events in the past versus as they happened. Here, he returned to the police station to speak about a murder that happened four days earlier. Your Honor, I mean, isn't anything of these ongoing emergencies, the identification is of something in the past? I think I had a case where the woman says the man had beaten her and she's on her porch, and then she says, there he goes again, but it's because she is identifying him. Suppose rather than going to a sketch artist, the person had made a sketch himself on the spot. Would that still be testimonial? No, Your Honor. Depending on the circumstances, if at the time the police arrived at the gas station and asked him what the perpetrator looked like, he drew out a sketch of that perpetrator, that would be a very different case. Suppose the same person made the sketch, but four days later. He reads in the paper that the guy is still at large. He says, my gosh, I've seen him, and he draws a sketch. Is that now illegal, unconstitutional? Because it's a passage of time of more than three hours, because we sort of know three hours can be okay, or the later Bryant case, where is that line going to be and why is it unreasonable interpretation? You see, part of the difference, of course, is we're here on AEDPA, and the Supreme Court has told the Sixth Circuit repeatedly that AEDPA really matters, and so maybe four days is too much, but nobody's told us so explicitly, have they? Certainly. There's been no time limit set, but the Supreme Court has also said that an ongoing emergency does not extend until a perpetrator is caught. And furthermore, we have to look at what… Where did it hold that? In Bryant, Your Honor. But in Bryant, they sort of specifically, as I had the quote here, they kind of slapped down the court saying that we didn't establish a specific limit. It's highly context dependent. Certainly, and that's why it's so important to look at the context of this sketch, where this sketch was created. It's important to see whether the relevant state court was reasonable when it looked at the context. Certainly, and it's patently unreasonable to say that there was an ongoing emergency in this situation. Furthermore, the Supreme Court has never said that interviews in a station house constitute an ongoing emergency. They've never extended the ongoing emergency doctrine to the… I'll tell you exactly the problem I'm having with this. You have this case or this couple of cases over here and this case, a couple of cases over here, where this is not an emergency and this is an emergency. And it looks real much closer to this one, a whole lot closer to it's not an emergency. It looks real close to not an emergency. But you don't have anything that says it's not an emergency, so a Supreme Court in the future could say an emergency is anything until the person is caught and not be overturning any of its previous cases, couldn't it? Certainly, Your Honor, they could do that. However, in this case… Consistently. I mean, without overruling anything, they could do that. We would argue that it wouldn't be consistent to say that an ongoing emergency… We're certainly arguing that they shouldn't do it, but they could do it and say, you know, this emergency means until he's caught. Certainly, but that would undermine the entire Confrontation Clause jurisprudence, as we, as amicus has argued. That would undermine confrontation rights for… Did you say Hammond case? Amicus. Amicus, okay, sorry. Yes, Your Honor, but that would undermine Confrontation Clause jurisprudence because it would mean that all statements that are made until a perpetrator is caught are non-testimonial. And that… The Supreme Court could do that, though. I mean, why can't they do that? Certainly, but they have not here. Under Davis and Hammond… We have to say, was the state court reasonable in coming up with something that would admit of a substantial weakening of the overall doctrine, but not necessarily a weakening of their previous case because their previous case only went so far? Certainly, it only went so far, but when the Supreme Court created this ongoing emergency doctrine, it was considered somewhat of an exception, and it should be ruled by the Supreme Court in creating it. There is a class of statements that would be considered testimonial that are non-testimonial because they are made in response to an ongoing emergency. But isn't that where, in Michigan v. Bryant, the language I was looking for was by assuming that Davis defined the outer bounds, the Michigan Supreme Court failed to appreciate that whether an emergency exists is highly context-dependent. They're sort of warning us not to just be limited to the past cases. Let's talk about context here because this isn't a cold case. Obviously, the amicus in your position wants us to fear that you'll be able to bring in things way down the road, but this is really a recording of something that was very contemporaneous, right? I mean, he, at least according to his statement, he saw the person at the time, and you seem to say that if the sketch had been done on the spot or fairly close, there would be nothing wrong with it. But that's the same, Your Honor, as if statements were made on the scene, such as in Bryant. Those are non-testimonial, but statements that are made about four days later at a station house are considered testimonial because so they're describing. Interestingly, so let's just suppose that the statement was made, but nobody heard it, but it got recorded, and four days later you find the recording. Yes, Your Honor, but that is in response. We have to consider what the ongoing emergency exception is about. And in Bryant, the court was very clear. The person is on the loose, right? Certainly, but they knew that this was a targeted drug killing. The facts of the case when Mr. Johnson went to the station house on the night of the murder suggest that he told the police that it was one of two men they were arguing with earlier in the day, and they knew that this was over drug turf, and it was much more similar to a domestic violence attack that we've seen in Davis and Hammond than a D.C. sniper situation where there's a person on the loose. So you're saying if it were a terrorist or some type of person that you think might strike again, that would be more plausible? It's a very different situation, and that is why the ongoing emergency exception is so context specific. That's sort of plausible, but are there any cases, let alone Supreme Court cases, where they've actually drawn that distinction? Well, the ongoing emergency exception that was drawn in Davis and Hammond, which is what the... But that's just a statement of it. Correct. Have we had any cases of any sort, let alone Supreme Court cases, that have tried to grapple with this, you know, what's the nature of the emergency, how dangerous is the murderer as opposed to some other murderer? No, Your Honor, and I don't have any to provide for you. But the essence of an ongoing emergency exception is that you're looking at the facts of the case and looking to whether there is, in fact, an ongoing emergency and whether the declarant believes there's an ongoing emergency when he is making the statement. And here... Is there a basis for the ongoing emergency exception, or is it constitutionally questionable? Absolutely not. It's certainly there's a basis for the ongoing emergency exception. Well, it allows people to testify who can't be cross-examined. Certainly. It's against the Constitution, doesn't it? Well, if you read the Confrontation Clause that way, you could see it as against the Constitution, but... You'd probably be arguing that if that case hadn't been there, right? Well... Wouldn't you? But the Supreme Court has somehow come up with an exception doctrine. We don't know whether it's a small exception or a big exception. How do we know whether it's a small exception or a big exception? Because on the basis of Davis and Hammond, when you have two cases that are so similar, and we're talking about events that are happening simultaneously, which the Court considers non-testimonial, and then events... The ones where they said there was an emergency. Yes, in Davis and then in... There is an emergency doctrine, which is larger, presumably, than the actual facts of that case, but we don't know how much larger. Well, we know from... The end of something that is not from the other case, right? Yes, and that limit in that case was 20 to 25 minutes. But you're saying we can't distinguish it from this case, and the other side is saying you can't distinguish it from the other case, but really it's in between the two cases, isn't it? It's in between Davis and Hammond. We would argue it is not even close to in between Davis and Hammond. We would argue that this is a purely Crawford case because this is a station house interview with the police, which is precisely what Crawford says the Confrontation Clause... Although I thought you had said if the station house interview, if the sketch had occurred an hour or two or three later... Not at the station house, Your Honor. So you think the station house makes it... That's the key. Even though you have to get to... So if the sketch artist comes to you after three hours, it's okay, but if you go to the sketch artist after three hours, it's not okay? No, Your Honor. In that case, as I said, it's context... Or does the sketch artist bring the station house with him? The sketch artist is typically at a station house. But here, in a station house, Crawford was very clear that station house interviews... Well, but then if Crawford is that clear, you'd be telling me that this would be unconstitutional if he had gone to the station house in 30 minutes. Certainly, because the U.S. Supreme Court... All right, that's the position? Yes. Okay. I'm sorry, I didn't want to push you if that wasn't where you were, but if that's your position, we'll record it. Certainly, that's our position. Okay, you have three minutes for rebuttal. Thank you. Your Honors, and may it please the Court, Linus Banghart Lynn, Assistant Attorney General for the State of Michigan, on behalf of the Respondent, Warden, and respectfully requesting affirmance. I think I'm going to address some of the concerns that are raised about the ongoing emergency doctrine or the ongoing emergency exception here. And I think that first I'm going to start by addressing, Judge Rogers, your question about what sort of the constitutional basis of that exception is. And I think the better way to understand it is as an inquiry into whether or not the statements made are testimonial. And I think there seems to be a misunderstanding, or at least a difference in understandings. Non-testimonial statements are not hearsay, so that's where the exception comes from. And I don't think that the ongoing emergency exception can be read to say, while an emergency is ongoing, whatever that may be, four days, a year, until the suspect is caught, that any information the police get in that time is non-testimonial and outside the scope of the Confrontation Clause. I think that's a too extreme argument. Now, you may be right in suggesting that until the Supreme Court says otherwise, we can rely on that argument. And maybe we win on that argument. But I don't think we need that extreme argument. I think what we can say is that while the emergency is ongoing, any information the police get that is relevant to the primary purpose of which is to deal with that ongoing emergency, that's non-testimonial and that falls outside the Confrontation Clause. And that's what we have here. The person being free is an emergency. The person being free, the killer being at large, the investigation still being active. We don't have a cold case that's been reactivated. That distinguishes it from the Supreme Court case which said that there was testimonial. When the two cases came down together, the one that said that it was testimonial, what's the name of that case? Hammond was the testimonial. Hammond, he had been apprehended. Right, he had been apprehended. There's a distinction from the case which said something was testimonial and there are all these distinctions from the case that said it was not testimonial. Well, I think what a better distinction with Hammond is is that the purpose of the information they received, it's not just the circumstance under which they got the information, but the information itself was not directed, was not gotten for the purpose of resolving any emergency. The information was, here's what he did to me. He pushed me into the furnace or something like that. But doesn't that argument just devour the distinction that the Supreme Court's trying to make between testimonial and non-testimonial because under that, I know you're saying you don't have to go to the full extreme, but under that, if the emergency, if the free, if because the actor, the perpetrator is free, that governs the distinction. That's not the argument. It informs the distinction. It's part of the inquiry. The key inquiry, as the Supreme Court has repeatedly said in cases post-Davis, is the primary purpose of the evidence that's created. And the primary purpose here is to apprehend a killer that's at large. I think Williams versus Illinois. If the primary purpose is to apprehend a killer that is at large, then as long as that killer is at large and you are providing some information that would help to find that person, if it's a year, that's okay. There's an ongoing emergency, and that defines testimonial versus non-testimonial. That seems to me to eat the rule. Okay. I understand, Your Honor. But I don't think it does because, again, the primary purpose, what is the primary purpose? And all of these cases recognize that the police serve sort of different functions and that the police serve a function of trying to keep the community safe. And one of those ways is by apprehending criminals who are at large. Another purpose the police serve is to investigate crimes for prosecution. And you have to look at the information and what purpose that was serving. Then why doesn't the distinction that your opposing counsel makes between location of where the statement is taken make a difference as to whether you intend to use it for prosecution? In every one of these, Davis, Hammond, Bryant, we are looking at something that occurred on site. Even Bryant was the shooting victim, but he made the statement as he was dying. So every one of those is in the field related to the perpetrator's action at issue. And now you have someone who says, come on by the police office, sit down with our interrogators, our investigators, and give them some information in this formal setting. Why isn't that a better distinction than whether the perpetrator is still at large? Because that is only a factor that goes to the ultimate question, which is the primary purpose. The Supreme Court has said primary purpose. So, well, you have to look at the facts to try to figure out what the primary purpose is. And, yes, in some cases, the fact of where this happens will govern the primary purpose. But if the police come to the scene, at the scene, and the victim says, here's what he did to me, right? The primary purpose there is not to apprehend somebody at large, right? The problem for me is if you analyze it that way, then you hold a trump card. And the trump card is we have not yet apprehended this perpetrator. And any time you want to get a statement and use it and make the testimonial versus non-testimonial distinction, you just lay down your trump card. And you say, it's been a year, still out there, and we're going after him. So how is there any rational basis on which to draw a line on how long you can keep on holding that trump card? It all comes back to primary purpose. But you are defining the primary purpose. It has to be supported. We can't just say, well, our primary purpose was to catch the guy. But a police officer would not say, our primary purpose is to apprehend the perpetrator. Sure, but you don't have to. That's reviewable. You don't have to take the officer and give complete deference to what the officer says. If the officer says, well, when I asked the victim to give all the details of what he did, that was in service of trying to apprehend them, the court's allowed to say, well, that doesn't make sense. And a principled distinction, would you say, could be employed to make that distinction if a perpetrator has been out one day versus a perpetrator who's been out six months versus one who's been out a year, two years, three years? I'm not seeing a principled way to make that distinction. I understand, and I don't think that it's this court, as a habeas court, I don't think that it's this court's job to draw a temporal line as far as when the cutoff is. I think a good place to draw the line is when the active investigation ceases, when the police sort of throw up their hands after, maybe it's a week, maybe it's a month, and they say... Maybe it's a year. Maybe it's a year. And they say, we're done with this, we'll put it in the cold case file, and maybe we'll look at it later when we have it. But isn't the real issue here not what we would do on direct appeal, but was the state court unreasonable in saying that the Supreme Court has not clearly established a rule that either four days is too much, even if you count it as four days, or your adversary's proposed rule that if you're at the station house, you lose. That might be a good rule, but it's hard to say that it's clearly established by the Supreme Court. So in one sense, you don't have to draw the line for us, you just have to say a bad line hasn't been clearly established. Correct. That's exactly it. How would it work with different kinds of crimes? I mean, we're talking about the law that is not just murderers, but also fraud or Social Security fraud or whatever. Is it an emergency if we don't know who this guy is that's committing this emergency, this identity theft, for instance? Can we interrogate people and then have their stuff be admitted if they're later unavailable in order to solve a crime like that? I guess the answer is that it depends. I mean, in every case you have to look at— At some point it would become unreasonable. Sure. Yeah. In every case you have— It would be an unreasonable application, perhaps, to do it for Bernie Madoff. Sure, because they know it's Bernie Madoff and what they're gathering is— Is it apprehension to keep the person from doing it again or is it whether the crime is solved more or less or not? To keep the person—to protect the public. Not just something to do the same thing again, but to do something really bad again. That's what makes it an emergency. If I have a hangnail, it's not an emergency. If I'm bleeding, it's an emergency, even though they're both on my hand. That's why when the police— If it's a felony, you're going to call them an emergency. You can call them. Sure, but again, the emergency— We're not saying that the emergency is a blanket that lets everything in. We're saying an emergency makes non-testimonial information that's received that is in service of solving that emergency. That's why the police arrest them when they find them. They don't say, well, we found the murderer and now here's your court date. Have a good day, right? They bring him in because a murderer who's at large— We recognize this as a dangerous person. Is the law in this case indistinguishable from— I'm wondering whether there's something special about a sketch. I mean, everything that both sides are saying, I assume, would be the same if instead of a sketch, you just had testimony that the person was cross-eyed and had a mustache. Sure. And there's no drawing involved. It's just here is some evidence of who did it, the person who did it. Right, there's not— Has a mustache and a beard and is cross-eyed, so to say. Right. I don't think there's anything special about a sketch. I think what—in both cases— Why you want to know whether the perpetrator was cross-eyed. Exactly. What's the primary purpose for generating this evidence? And the fact is the police don't generate sketches to use at trial. And I think that's a key fact that I think pretty much sinks this case for the petitioners. They don't because they think he's going to be available. They probably don't take the evidence that he's cross-eyed for use in court. But again, when they— They'll get this person in or they'll catch the person and then they'll— But if he's unavailable and we need to know who it was, you might then want to get it in. Well, they've got Johnson there and they say, well, describe what you've seen and describe what else you know. Do you know this about Harris? Do you know this about Woods? That's not in service of solving this emergency, right? So that's the thing. You don't get to say, well, because there was an emergency, everything Johnson said at the time comes in. You say because there's an emergency, everything that Johnson said that was to help the police protect the public by solving this emergency is non-testimonial. And the sketch was not introduced at trial, is that right? The sketch was introduced. Was introduced, okay. Without objection. There was a belated objection, not on constitutional grounds. There was no constitutional objection. A key piece of testimony in light of— It was not— In light of arguments that there's problems now with the—what's her name? Taylor, right. I mean, the jury heard a lot of information about Taylor's credibility and still decided to credit her testimony. Can I ask a question? Was Taylor shown that sketch before she said, I know who did it? Or did she say, I think Ferd did it, and then they showed her the sketch? I believe—that I'm not sure about, Your Honor. It would kind of make a difference in terms of prejudice, wouldn't it? As long as— If you thought that Taylor was scrounging around for a way to get points with the police and they said, well, did this person do it? She says, wow, that was Ferd. Right. I'll say Ferd. Sure. I think it makes a difference as to prejudice. I think as long as the jury heard that and was able to assess her credibility accordingly, as long as the jury knew what the right order was, which it did—whatever the case was. The jury didn't know about— The police report about Taylor was within the 24 hours of the shooting, so that would mean she couldn't have been shown the— Say that again. I said my—at least my record site here, I don't have the quote, but was that Taylor had talked to the police less than a day after the shooting. But she didn't identify him. And would have—I thought so, but I can read the record. I'm sorry. Perhaps either one of them can. I thought that she identified it before she was shown the photo because she knew Ferd. This was not a stranger to her. This was someone that she knew. And so she recognized him, and I don't think it was— But part of the issue is the ability to place this in the record when the person who gave them the information on the sketch is deceased and the implication is left to the jury that the defendant dispatched the person who would have testified against him. That's the essence of why a confrontation clause matters, isn't it? The essence of why the confrontation clause matters. Because you are admitting statements or sketches or whatever else it is, and no one has the opportunity to ask the person who made the statement or suggested how the sketch should be. No one is able to call them into question, to challenge their credibility so that the jury says, you know what, I don't believe that guy. That's gone if you're able to admit that evidence. That's true, but— It's gone in every emergency case. Under their argument. But again, the Supreme Court has rejected these arguments about— the Supreme Court has said the confrontation clause means what it means, and we have—I mean, there's a countervailing point to your point, Your Honor, which is that here where we have no reason for Johnson to fabricate the sketch because he didn't know the defendant, there's no reason to doubt it. That doesn't govern the confrontation clause question. We can't come in here and say, well, this is testimonial, but it's very, very reliable, and so we win. The Supreme Court's rejected that, and the same— and I think that that's just the mirror image of your argument to say, well, we would really like the defendant to be able to look at Johnson's credibility. No, both of those arguments are off the table. The question is, was this testimonial, and was it hearsay? And because it wasn't testimonial, the competing policy arguments— or I don't know if you call them policy arguments, but the competing arguments that you've made and that I've just said are really off the table. It's really just a matter of whether it was testimonial, and it wasn't. And even if it was, the Supreme Court has never categorically said it was, and the Michigan—the State Court was reasonable. And my time is up. I'd be glad to answer any other questions. I think I may be wrong. Go ahead. Thank you, Your Honor. I'd like to begin by just pointing out the fact that Chavez Johnson, as you were pointing out, this is precisely the evil that the Confrontation Clause is meant to protect against, and that is because Chavez Johnson made exculpatory statements regarding Mr. Woods at the scene of the crime, saying that it was one of two men who argued with them earlier in the day, and it's undisputed, based on this record and by everyone, that Mr. Woods was not one of those two men. So the fact that an eyewitness identification came in, looked like Mr. Woods, and yet the jury never heard the exculpatory statements, that is precisely the problem that we have here, and that's precisely why the Confrontation Clause violation is so egregious here. But beyond that, just moving to Bryant briefly, Bryant, that's a huge—he's hugely distinguishable from this case because Bryant is about a dying victim laying on the ground within blocks and minutes of the scene of the crime. When police arrived, they had no idea if the shooter was in the vicinity, what was going on. And furthermore, Bryant is rooted in this excited utterance, dying declaration, hearsay exception. And here, we don't have those same assurances of reliability when he— Do you think that informed the Supreme Court's decision? It certainly did, and it's cited in the Supreme Court's— Does that suggest that it might inform a Supreme Court's decision later when it's deciding a case like this one? Certainly. Consistent with its precedents, it could say, well, you know, we're familiar with all that dying declaration policy, and some of that suggests that when you have someone like this who died but did something fairly persuasive before he died, it ought to be admitted. There's a very big distinction in a dying declaration hearsay exception, and that is that the victim is dying at the time he makes those statements. Here we have a person who came into the police station after being considered a suspect in this murder and comes back to the police station to identify a murderer. That is vastly different than someone who's laying on the ground, including the victim in Bryant, who's laying on the ground saying, I know who shot me because he's dying. Given that statement in Bryant, why did the Supreme Court go to the trouble then of sort of chastising the Michigan Supreme Court for apparently limiting the doctrine to the outer bounds of Davis? It sounds like Bryant would be well within Davis, not even a little bit beyond Davis. Certainly, and I think that's because the Michigan Supreme Court was focused on time when they were making their decision in Bryant, and that's not what the focus should be when looking at whether there's an ongoing emergency. Certainly time is a factor. So I guess I had heard you say that in Bryant it was within minutes, but you're saying it was longer in Bryant? I believe they extended it about two hours in Bryant, which is in fact the furthest that the Supreme Court has ever gone in extending the ongoing emergency exception, and that extension, I'd like to point out, made four members of the court extremely uncomfortable, and they were very upset, including Justice Scalia, who was perhaps the architect of Crawford. Oh, sorry, I see I'm out of time. Was Scalia dissenting there because he didn't want any exceptions to Crawford? Exactly. Okay, but he was uncomfortable as soon as you have any exception whatsoever, and he wasn't in the majority. I'm sorry, did you have a question? No, I'm finished. Could you answer the question about whether the sketch was shown to Taylor before Taylor identified? Yes, and I'm actually glad you asked me because I'd like to correct. Sandra Taylor did not identify Mr. Woods until four months after the fact, not a day after the murder. I was mistaken about that, but was she shown the sketch? Because then when I got on the right page, Officer Carlisle tracked her down at a homeless shelter, but did he show her the sketch at this? I said Ferdinand and was shown the sketch. In which order? She identified Ferdinand first. First, and then she was shown the sketch. And she was shown the sketch. That's according to her? That's according to the record that's in the trial transcript. Probably to Officer Carlisle and to her, I guess. Yes. She identified Ferdinand first, okay, and then confirmed it with being shown the sketch. Yes. I got the wrong Taylor. There's another Taylor. The question is the testimony that is heard. Yes, and that's the issue. And it's also very important to note that she had the most basic pieces of the ID while she said Ferdinand. She was saying that the shooter had braided hair. She didn't identify Mr. Woods. That was shown, but I think the reason that the order is of some importance is as to whether the sketch was, how important was it? It was really, it would be even more important if it had been shown to her beforehand. Yes, but given that she was so discredited, so thoroughly discredited at trial, and this served as an independent eyewitness identification, this is certainly not harmless error. Okay. Thank you, counsel. Very well argued on both sides. We appreciate it. And the case will be submitted, and the clerk may indicate the last case will be submitted on briefs, and you may adjourn court.